# United States Court of Appeals
## For the First Circuit

No. 03-1322

FIREMAN'S FUND INSURANCE COMPANY,

Plaintiff, Appellee,

v.

SPECIAL OLYMPICS INTERNATIONAL, INC., AND
SPECIAL OLYMPICS OF MASSACHUSETTS, INC.,

Defendants, Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

David Lee Evans with whom Theodore J. Folkman and Hanify &
King were on brief for appellants.
John B. Farley with whom Gregory R. Faulkner, Ralph W.
Johnson, III, Salvatore N. Fornaciari, and Halloran & Sage LLP were
on brief for appellee.

October 10, 2003

**COFFIN**, <u>Senior Circuit Judge</u>.   Between 1991 and 1999, an employee of appellant Special Olympics of Massachusetts, Inc. (SOMA),[1] conducted a fraudulent fund-raising campaign – ostensibly on  behalf of the organization – that raised more than $1 million. He used most of the funds for personal expenses.   SOMA filed a claim with appellee Fireman's Fund Insurance Co. under an employee fidelity policy covering losses stemming from employee dishonesty. The  insurer  disputed  coverage  and  initiated  this  declaratory judgment  action.    On  cross  motions  for  summary  judgment,  the district  court  concluded  that  the  stolen  funds  belonged  to  the putative  donors  rather  than  SOMA  and  that  the  organization therefore  did  not  suffer  a  loss  covered  by  the  policy.    It consequently granted summary judgment for the insurer. <u>See</u> 249 F. Supp. 2d 19 (D. Mass. 2003).   We agree with the district court's conclusion, but have chosen a slightly different path.

### I. <u>Background</u>

Gerald Tenglund was hired in 1990 as an area manager for SOMA, whose mission is to provide opportunities for high quality sports training and competition for Massachusetts athletes with mental retardation and other related disabilities.   A year later, he started a fund-raising campaign using SOMA's name but without the organization's  knowledge.    Although  area  managers  were  not

---

[1] SOMA  is  an  affiliate  of  Special  Olympics  International, which also is a party in this case.  For convenience, we refer primarily to SOMA in our discussion.

permitted to conduct direct marketing activities, Tenglund hired telemarketers to solicit funds.  He deposited the donated money into an unauthorized checking account that he opened using SOMA's taxpayer identification number.  Between August 1992 and June 1999, Tenglund deposited more than $1.1 million into the account and withdrew all but $6,200.[2]  A small amount of the money was spent to fund authorized Special Olympics activities and to pay a stipend to the telemarketers; the remainder was used solely for Tenglund's personal expenses.

SOMA learned of the illicit fund-raising in April 1999 when one of the donors contacted its state office about an improperly endorsed check that had been returned by her bank.  SOMA gained control of the unauthorized account in late May 1999 and Tenglund was terminated in July.  With the help of an auditor, SOMA subsequently was able to determine the amount of money that had passed through the account since 1992.

During the relevant time period, SOMA was insured against losses resulting from employee theft under crime insurance policies issued by Fireman's Fund.[3]  The policies indemnified SOMA for loss of "Covered Property," including cash, attributable to "Employee dishonesty," which was defined in relevant part as "dishonest acts

---

[2] The bank retained records for only seven years, and account activity before August 1992 was therefore not available.

[3] The policies were the same, but covered different time periods.

committed by an employee . . . with the manifest intent" to cause loss to the employer and to obtain financial benefit for the employee or a third party. See Coverage Form A at 1-2 ¶¶ A(1),(2), D(3). The policies exclude "indirect loss," which is defined in relevant part as

> Loss that is an indirect result of any act or occurrence covered by this insurance including, but not limited to, loss resulting from:
>
> a. Your ability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.

Policy General Provisions at 1 ¶A(3).

SOMA submitted a proof of loss form that listed the amount at issue as $1,092,800. Fireman's Fund denied the claim on the grounds that (1) SOMA did not suffer a direct loss covered by the policies, (2) Tenglund was not a covered employee, and (3) the notice of loss was untimely. We address only the first point because we agree with the district court's conclusion that SOMA did not experience a covered loss, a determination that compels judgment for the insurer.[4]

## II. Discussion

We review a district court's grant of summary judgment de novo, assessing the facts and inferences to be drawn from them in

---

[4] The district court likewise did not address the other two grounds.

the light most favorable to the non-moving party. Sparks v. Fidelity Nat'l Title Ins. Co., 294 F.3d 259, 265 (1st Cir. 2002). Under Massachusetts law, which governs this diversity case, see Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 46 (1st Cir. 2003), we construe an insurance policy de novo under the general rules of contract interpretation, see Brazas Sporting Arms v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000). The "baseline rule" in Massachusetts is that "insurance contracts must be interpreted to reflect the intention of the parties as manifested by the policy language," Lexington Ins. Co., 338 F.3d at 47, and, absent ambiguity, "'the words of an insurance contract . . . "must be construed in their usual and ordinary sense,"'" Utica Mut. Ins. Co. v. Weathermark Investments, 292 F.3d 77, 80 (1st Cir. 2002) (citation omitted).

An insurance policy is to be read "'as a whole "without according undue emphasis to any particular part over another."'" Mission Ins. Co. v. U.S. Fire Ins. Co., 401 Mass. 492, 497, 517 N.E.2d 463, 466 (1988) (quoted in Utica Mut., 292 F.3d at 80) (citation omitted); see also Cochran v. Quest Software, 328 F.3d 1, 7 (1st Cir. 2003) ("[C]ourts may not single out an isolated word or phrase at the expense of the language as a whole."); USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass. App. Ct. 108, 116, 546 N.E.2d 888, 893 (1989) ("The object of the court is to construe the

contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.").

In this case, the district court found that SOMA was not the owner of the money embezzled by Tenglund during his nearly eight-year scheme and that the organization therefore had no loss and no coverage under the policies. In the court's view, the victims of Tenglund's theft were the potential donors who were deceived into believing that their donations were supporting SOMA. The court recognized that SOMA may have suffered a loss in reputation and perhaps a decrease in future donations as a result of Tenglund's fraud, but observed that such a loss would affect only an intangible asset that was not covered by the policies. In addition, the court noted that SOMA would suffer a loss if it chose to reimburse the deceived donors, but stated that such reimbursement also would not trigger coverage because it would fall within the policies' "indirect loss" exclusion.

On appeal, SOMA presses its claim that, under principles of Massachusetts gift law, the funds turned over to Tenglund by the donors were fully consummated gifts to the organization, bringing the theft of this newly acquired property within the policies' coverage. SOMA argues that this loss was "direct" – it was money taken from the organization itself – and it thus did not fall within the policy exclusion for "indirect loss."

SOMA's theory may in part accurately state the law; if the donations had become SOMA's property under state gift law before Tenglund diverted the funds, his theft would appear to have resulted in a direct loss to the organization.  The technicalities of gift law are not, however, dispositive.  Even if Massachusetts law would view the donations as fully delivered and thus SOMA's property once they were deposited into the unauthorized bank account – an issue we need not and do not consider – the question remains whether this loss of property, albeit direct, would fall within the policies' coverage.

Based on our reading of the fidelity policy as a whole, we conclude that it would not.  Pivotal to our determination is the definition of employee dishonesty that appears in Coverage Form A of the policy, at ¶D(3), which limits coverage to dishonest acts "committed . . . with the manifest intent" to cause the employer to sustain loss, as well as with the intent to obtain financial benefit for the employee or a third party.

The manifest intent requirement was added to fidelity policies about twenty-five years ago to narrow the scope of employee dishonesty provisions in the face of court decisions that had been broadly construing coverage.  See, e.g., Resolution Trust Corp. v. Fid. & Deposit Co. of Md., 205 F.3d 615, 638 (3d Cir. 2000); Michael Keeley, Employee Dishonesty Claims: Discerning the Employee's Manifest Intent, 30 Tort & Ins. L.J. 915, 919 (Summer

1995). The goal of the new language was to confine coverage to classic episodes of employee dishonesty, a category in which embezzlement is the prime example. See, e.g., Gen. Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51, 53-54 (4th Cir. 1996) (employee dishonesty policies are "designed to provide coverage for a specific type of loss characterized by embezzlement, which involves the direct theft of money"); Keeley, supra, at 919, 924.

The precise meaning of the phrase has remained somewhat elusive, however, engendering much discussion about the necessary level of culpability; the debate centers on whether the employee must specifically have desired to cause a loss to the employer, or whether it is enough that a loss was substantially certain to result from the dishonest conduct. See Resolution Trust, 205 F.3d at 638-643 (comparing the two "manifest intent" approaches to the concepts of general intent and specific intent in criminal and tort law); Keeley, supra, at 916; Christopher Kirwan, Mischief or "Manifest Intent"? Looking for Employee Dishonesty in the Uncharted World of Fiduciary Misconduct, 30 Tort & Ins. L.J. 183, 186 (Fall 1994).

That debate is not pertinent here, however, other than to confirm that, at the very least, covered employee misconduct must reflect some level of intent to cause a loss to the employer. Here, by contrast, the facts reveal a scheme that was carefully crafted to bypass the insured entirely; although Tenglund

capitalized on the organization's sympathetic charitable mission, his deception was directed at individual donors. And, unlike the classic case of embezzlement, in which the employer's existing funds are diminished by the dishonest employee's conduct, Tenglund's scheme generated new funds, unanticipated by SOMA, specifically for his own benefit. This scenario falls outside even a broad interpretation of what it means for an employee to have "manifest intent to . . . [c]ause [the employer] to sustain loss." Contrary to SOMA's assertion, Tenglund's obvious intention to enrich himself reflects neither an expectation that his dishonesty would inflict a loss on his employer nor the inevitability of such an outcome.

SOMA acknowledges that courts typically deem third-party losses as outside the coverage of fidelity policies, see, e.g., Lynch Props., Inc. v. Potomac Ins. Co. of Ill., 140 F.3d 622, 624 (5th Cir. 1998) (no coverage where employee misappropriated funds from the personal account of a client and not from the covered employer); Cont'l Cas. Co. v. First Nat'l Bank of Temple, 116 F.2d 885, 887 (5th Cir. 1941) (employees' diversion of new bank deposits to cover prior thefts would be losses of third parties and not the bank "if the money actually went into the bank . . . and the bank did not suffer diminution of its assets"); Cont'l Bank, N.A. v. Aetna Cas. & Sur. Co., 164 Misc.2d 885, 889, 626 N.Y.S.2d 385, 388 (N.Y. Sup. Ct. 1995)("Coverage was not triggered because the loss

resulted from transactions in a customer's account."), but it seeks to distinguish the cases so holding from the present circumstances by emphasizing that Tenglund's theft was of money nominally SOMA's.

With respect to intent, however, these cases are equivalent in that the dishonest employees' misappropriations were structured to avoid diminishing the assets of their employers, undoubtedly in part to minimize the risk of detection. See, e.g., Lynch Props., Inc. v. Potomac Ins. Co. of Ill., 962 F. Supp. 956, 962 (N.D. Tex. 1996), aff'd, 140 F.3d 622 (5th Cir. 1998) ("All inferences from [the employee's] behavior indicate that she did not want [her employer] involved in, or harmed by, her embezzlement."); Cont'l Bank, 164 Misc.2d at 888, 626 N.Y.S.2d at 387 ("The manifest intent of these scoundrels was to make money, not to cause [their employer] to lose money."). As in these other cases, Tenglund used his employment both to design and to mask his artifice, but his financial target was the funds of outsiders. Even if a legal technicality had converted the funds to SOMA's ownership in the course of the fraud, the character of the deception – the "intent" – would have remained unchanged.

We acknowledge that Tenglund's fraudulent activity may, in fact, have had a financial impact on SOMA either by reducing genuine donations that would have been made if the money had not already been "contributed," or by tainting subsequent fund-raising

-10-

efforts by SOMA. While we are sympathetic to SOMA's concern for its good name, we are constrained by the confines of the policies.

In sum, SOMA's fidelity insurance policies, consistent with the industry standard, contained provisions that unambiguously limited coverage to episodes of employee dishonesty that involved conduct intended to lead to a diminution in the insured's assets. SOMA offers no facts that would permit a factfinder to conclude that Tenglund's fraudulent scheme was directed at the organization's resources. Without any evidence of such "manifest intent," SOMA is unable to prove a loss within the coverage of the policy. The district court therefore properly granted summary judgment for Fireman's Fund.

<u>Affirmed.</u>