RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0318p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TOOLING, MANUFACTURING AND
TECHNOLOGIES ASSOCIATION,
                        *Plaintiff-Appellant*,

    *v.*

HARTFORD FIRE INSURANCE COMPANY,
                        *Defendant-Appellee*,

MARK TYLER, TEAM MARKETING GROUP,
INC., dba Tyler Construction, Incorporated,
Team Benefits Group, Incorporated, Allied
Risk, Incorporated, and MARK TYLER &
ASSOCIATES, INC.,
                        *Third-Party Defendants*.

No. 10-2480

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 2:08-cv-11812—Stephen J. Murphy III, District Judge.

Argued: February 28, 2012

Decided and Filed:  September 11, 2012

Before:  BATCHELDER, Chief Judge; NORRIS and STRANCH, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Elaine Ann Parson, STROBL & SHARP, PC, Bloomfield Hills, Michigan, for Appellant.  James R. Case, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Elaine Ann Parson, Krista A. Jackson, STROBL & SHARP, PC, Bloomfield Hills, Michigan, for Appellant.  James R. Case, Joanne Geha Swanson, Jason C. Yert, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Appellee.

    BATCHELDER, C. J., delivered the opinion of the court in which NORRIS, J., joined, and STRANCH, J., joined in Sections I. and II.A.  STRANCH, J. (pp. 19–23), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

ALICE M. BATCHELDER, Chief Judge.   At its core, an insurance policy is simply a contract between the insurer and the insured, with each entitled to the benefit of the bargain.  This statement encapsulates two self-evident but fundamental tenets of contract law—that generally speaking:  (1) the benefit of the bargain directly accrues only to the parties to the contract, unless the contract otherwise provides; and (2) the parties are entitled only to the benefit of *their* bargain, that is, the bargain represented in the written contract.  These two tenets decide this appeal.

Here, the insured is Plaintiff-Appellant Tooling, Manufacturing & Technologies Association (TMTA) and the insurer is Defendant-Appellee Hartford Fire Insurance Company.  The insurance policy at issue, known as the CrimeShield Policy (Policy), is a type of employee fidelity policy designed to transfer the risk of employee theft from the TMTA to Hartford.  The TMTA's decision to insure against employee theft was prescient—almost immediately after the parties signed the Policy a TMTA employee began diverting funds into his own accounts that would have otherwise, in the fullness of time, accrued to the TMTA.

The problem for us is that the pilfering employee, one Mark Tyler, diverted funds not from the TMTA but from the TMTA Insurance Agency (Agency)—a limited liability corporation controlled by the TMTA and from which the TMTA receives a significant portion of its income.  And the Agency is not a named insured under the Policy.  Hartford refuses to pay the policy because of its view that the Agency, not the TMTA, suffered the loss and the Agency is not a named insured.  The TMTA appeals to us to enforce its interpretation of the Policy, arguing that the Agency is covered because the TMTA is covered, and that any loss to the Agency is actually a direct loss to the TMTA—direct losses being covered under the Policy's express terms.

So is Hartford's refusal to pay the TMTA's claim on the Policy a breach of contract? The issues are twofold: (1) may we consider the Agency a party directly covered by the policy, and (2) regardless of the resolution to the first issue, does the Policy otherwise provide for the TMTA to recover funds that were diverted from the Agency? Because the answer to both questions is "no," there is no breach, and we affirm the judgment of the district court.

## I.

The TMTA is a Michigan trade association whose members are engaged primarily in the manufacturing and tooling industry. The TMTA arranges the sale of insurance policies to its members as part of its normal activities, but because Michigan law does not permit the TMTA to collect commissions directly from insurance companies,[1] the TMTA created the Agency as a licensed producer to facilitate receipt of the commissions. The district court noted:

> [The Agency] is a Michigan limited liability company that brokers insurance policies for TMTA members. TMTA is the Agency's sole member and TMTA's entire revenue derives primarily from the Agency in the form of commissions from insurance companies paid directly to the Agency for brokering policies to TMTA members. The Agency has no employees and its property consists only of the commissions paid to it by insurance companies for sales of policies to TMTA members. TMTA accounts for all of the Agency's income as part of its federal and state filings. Thus, each year, TMTA receives the entire benefit or loss from the Agency's operations.

*Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co. (Tooling I)*, No. 08-cv-11812, 2010 WL 3464329, at *2 (E.D. Mich. Aug. 30, 2010). The TMTA hired Tyler to be the Agency's general manager "for the purpose of brokering life, health, disability, and accident insurance for TMTA members," but Tyler was paid and employed by the TMTA, not the Agency. *Id.*

---

[1] Mich. Comp. Laws § 500.1240 (2002) ("An insurer or insurance producer shall not pay a commission, service fee, or other valuable consideration to a person for selling, soliciting, or negotiating insurance in this state if that person is required to be licensed under this chapter and is not so licensed."). TMTA is not a licensed producer under Michigan law, so it created the Agency as a licensed producer that can lawfully receive the insurance commission payments.

In September 2003, the TMTA—then known as the Michigan Tooling Association—procured the Policy from Hartford. The Policy covered employee theft (up to $300,000), depositor's forgery, non-employee theft, disappearance and destruction, and computer and funds-transfer fraud. In addition to the TMTA, the Policy and its amendments listed six other named insureds[2]—but not the Agency—and the Policy provided that "[a]n 'employee' of any Insured is considered to be an 'employee' of every Insured." The employee theft provision of the Policy provided that: "We will pay for loss of or damage to 'money', 'securities' and 'other property' which results *directly* from 'theft' by an 'employee', whether or not identifiable, while acting alone or in collusion with other persons." The parties now debate the meaning of the word "directly,"[3] but do not dispute that Tyler met the definition of employee under the Policy or that there was a theft.[4]

The Policy also contained a number of exclusions to coverage, including:

Loss that is an *indirect* result of any act or "occurrence" covered by this Policy including but not limited to loss resulting from

1.      your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".
2.      payment or damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this policy.

---

[2]The other named insureds were: MTA Salaried Employee Defined Benefits Plan; MTA Money Purchase Pension Plan; MTA Salaried Employee Defined Contribution Plan; MTA Deferred Compensation Plan; MTA Insurance Trust; and MTA Dental Trust.

[3]The Considerations clause of the Policy also placed an emphasis on "direct" harms:

In exchange for the payment of premium and subject to the Declarations, Insuring Agreements, Definitions, Exclusions, General Conditions, and terms of the Policy, we will pay for loss which you sustain resulting directly from acts committed or events occurring after the RETROACTIVE DATE shown in the SCHEDULE and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in the EXTENDED PERIOD TO DISCOVER LOSS General Condition.

[4]On appeal, Hartford argues that Tyler's actions do not qualify as a "theft" under the Policy. Because Hartford did not make this argument to the district court, the argument is forfeited barring a "plain miscarriage of justice," which is not the situation here. *See, e.g.*, *Dealer Computer Svcs., Inc. v. Dub Herring Ford*, 623 F.3d 348, 357 (6th Cir. 2010).

3.        payment of costs, fees or other expenses you incur in establishing either the existence of or the amount of loss under this policy.

The parties also dispute the applicability of this provision to the facts of the case. Finally, the Policy defines "theft" as "the unlawful taking of 'money', 'securities' or 'other property' *to the deprivation of the insured*," and further that "this Policy is for your [the named insured's] benefit alone and no other person has any rights or benefits."

In early 2007, Tyler resigned from his position at the TMTA. Soon thereafter, the TMTA discovered that, using entities that he owned, Tyler had re-directed to himself commission payments that were due to the Agency, in effect stealing over $715,000 in commissions that would have eventually accrued to the TMTA. *Tooling* I, 2010 WL 3464329, at *2. The TMTA notified Hartford of the theft and filed a claim against the Policy. The TMTA and the Agency also filed a suit in state court against Tyler alleging misappropriation of commissions. *Id.*; *Tooling, Mfg. & Techs. Ass'n v. Tyler* (*Tyler I*), No. 07-081120-CZ, slip op. at 5–6 (Mich. Cir. Ct. Aug. 20, 2009). Although the TMTA and the Agency prevailed in the state court lawsuit against Tyler, Hartford refused to make a determination of coverage. *See Tooling, Mfg. & Techs. Ass'n v. Tyler* (*Tyler II*), No. 293987, 2010 WL 5383529, at *1 (Mich. Ct. App. Dec. 28, 2010); *Tooling I*, 2010 WL 3464329, at *2.

The TMTA brought this action in state court seeking a declaratory judgment and damages for breach of contract, and Hartford removed the case to federal district court on the basis of diversity jurisdiction. The parties filed cross-motions for summary judgment and agreed that there were no issues of disputed fact and that judgment could be rendered as a matter of law. *Id.* The parties dispute whether the injury suffered by the TMTA arose "directly" from Tyler's illegal conduct while he was an employee of the TMTA. In essence, the TMTA argued that the injury was direct because the TMTA's injury was a natural and unavoidable consequence of Tyler's conduct, and Hartford argued that the injury was indirect because the commissions were diverted from the Agency and the Agency is not a named insured under the policy. The district court

granted summary judgment to Hartford, holding that: (1) the TMTA cannot have a direct interest in the commissions due to the Agency because the Agency is a separate entity under Michigan law; (2) the Agency is not a named insured in the Policy; (3) the exclusion clause barring recovery for indirect losses applies to the commissions stolen by Tyler; and (4) Tyler only had a duty to turn the stolen commissions over to the Agency, not to the TMTA. *Id.* at \*4–7. The TMTA filed a timely appeal.

## II.

We review de novo a district court's decision on a motion for summary judgment, and summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Defoe v. Spiva*, 625 F.3d 324, 330 (6th Cir. 2010) (internal quotation marks and citations omitted). On summary judgment, all inferences to be drawn from the facts must be "viewed in a light most favorable to the non-moving party." *Id.* Because the parties agree that there are no material disputes of fact, the only issue is whether Hartford is entitled to judgment as a matter of law.

Subject matter jurisdiction in this case is premised solely on diversity of the parties, so we apply Michigan law as enunciated by the Michigan Supreme Court. *See, e.g.*, *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007); *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). Where the Michigan Supreme Court has not addressed an issue, we may look to opinions issued by the Michigan appellate courts and should follow their reasoning unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise." *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2001). Under Michigan law, a court "must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established principles of contract construction." *Citizens Ins. Co. v. Pro-Seal Serv. Group, Inc.*, 730 N.W.2d 682, 685 (Mich. 2007). Indeed, Michigan courts have recognized that "[a]n insurance policy is much the same as any other contract. It is an agreement between the parties in which a

court will determine what the agreement was and effectuate the intent of the parties."
*Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433 (Mich. 1992). The Michigan
Supreme Court has identified the following insurance-contract-interpretation principles:

> First, an insurance contract must be enforced in accordance with its
> terms. A court must not hold an insurance company liable for a risk that
> it did not assume. Second, a court should not create ambiguity in an
> insurance policy where the terms of the contract are clear and precise.
> Thus, the terms of a contract must be enforced as written where there is
> no ambiguity.
>
> While we construe the contract in favor of the insured if an ambiguity is
> found, this does not mean that the plain meaning of a word or phrase
> should be perverted, or that a word or phrase, the meaning of which is
> specific and well recognized, should be given some alien construction
> merely for the purpose of benefiting [sic] an insured. The fact that a
> policy does not define a relevant term does not render the policy
> ambiguous. Rather, reviewing courts must interpret the terms of the
> contract in accordance with their commonly used meanings. Indeed, we
> do not ascribe ambiguity to words simply because dictionary publishers
> are obliged to define words differently to avoid possible plagiarism.

*Citizens Ins.*, 730 N.W.2d at 685–86 (citation omitted).

The court applies these principles in a two-part test to determine "whether an
insured is entitled to insurance benefits": "First, we determine if the policy provides
coverage to the insured. If it does, we then ascertain whether that coverage is negated
by an exclusion."[5] *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 510 (Mich.

---

[5] The district court declined to address the first step of Michigan's rule, collapsing the two-part inquiry into one by stating that "[t]he question, then, is whether TMTA's loss due to Tyler's theft was indirect. If the loss falls into one of the examples of indirect loss provided in the Policy, TMTA's loss is excluded from coverage." *Tooling I*, 2010 WL 5383529, at *4. The district court chose to interpret the meaning of a direct loss by its interpretation of an indirect loss under the exclusions clause. In other words, because the type of loss claimed by the TMTA is an indirect loss barred by the exclusions clause, it is not a direct loss under the employee theft provision. This is wrong for two reasons. First, we must follow Michigan law in this case, and the Michigan courts have clearly articulated a conditional two-part inquiry—if the first step is met, then the second may be taken, not the other way around.

Still, the error would have been harmless had the exclusions clause been appropriate in this case, which brings us to our second reason: the district court incorrectly interpreted the Policy's "indirect loss" exclusions clause. The clause begins by excluding loss "that is an indirect result of any act or 'occurrence' *covered* by this Policy," and then gives several examples of indirect loss that is excluded, including "your inability to realize income that you would have realized had there been no loss of or damage to 'money', 'securities' or 'other property'." R. 37, Ex. D., part V.H., PG ID 410 (emphasis added). We conclude, based on a plain reading of the provision, that this clause applies where there is direct loss—covered by the Policy—from which the insured derives indirect losses, which are not. *See Patrick Schaumburg Autos., Inc. v. Hanover Ins. Co.*, 452 F. Supp. 2d 857, 871–72 (N.D. Ill. 2006) (analyzing a very similar exclusions

1995).  "Exclusionary clauses in insurance policies are strictly construed in favor of the insured . . . . [But] [c]lear and specific exclusions must be given effect."  *Auto-Owners*, 489 N.W.2d at 434.  Finally, the insured has the burden to demonstrate that its claim falls within the terms of the policy.  *See Heniser*, 534 N.W.2d at 510.

**A.**

In addressing whether the employee-theft clause itself entitles the TMTA to recover under the Policy, we first examine whether the Agency is covered by the Policy. If it is, then the TMTA is entitled to recover under the Policy, as Hartford freely admits. As we mentioned, the Agency is not named in the Policy as a covered insured.  Although this fact might normally end our inquiry on this point, we recognize that the Agency and the TMTA are unusually consanguineous.  The TMTA argues that this close relationship essentially erases any difference between the TMTA and the Agency for the purposes of the contract, that any injury to the Agency under the contract is an injury to the TMTA, that the entities are separate only to fulfill a technical legal requirement, and that to bar recovery because the TMTA and the Agency are technically separate would be mere sophistry.  We are not convinced by the TMTA's argument.

Rather than simply analyze the degree to which the interests of the TMTA and the Agency overlap, here we must "effectuate the intent of the parties," *Auto-Owners*, 489 N.W.2d at 433—that is, the TMTA and Hartford—and a plain reading of the Policy does not reveal that the parties mutually intended to cover the Agency under the Policy.

clause and stating that "the indirect loss exclusion at issue here is not ambiguous . . . . [T]he policy draws a distinction between the loss of the intrinsic value of the asset, which is [covered], and the loss of the asset's potential for generating income including profit, which is excluded."); *see also Benchemark Printing, Inc. v. Am. Mfrs. Mut. Ins. Co.*, No. 00-CV-0865, 2001 U.S. Dist. LEXIS 619, at \*7–8 (N.D.N.Y Jan. 26, 2001) ("The policy contains a provision which excludes from coverage the insured's 'inability to realize income that [it] would have realized had there been no loss of . . . Covered Property.' . . . [T]he plaintiff claims that the 'covered property' is lost profits.  Therefore, in order for the exclusion to apply, the plaintiff would have to be seeking to recover the income it would have realized from the lost profits, such as interest.  However, that is not what the plaintiff is claiming.  Rather, the plaintiff's claimed loss is allegedly the covered property, not the inability to realize income from the covered property. Accordingly, the insurance policy's provision which excludes indirect losses from coverage does not apply in this case."); *cf. Heniser*, 534 N.W.2d at 510 ("Policy exclusions are based on the presumption that the insured already has established that the policy covers the property in question.  The question then becomes whether this particular loss is excluded from coverage for some reason.").  Here there is only one type of loss, the diverted commissions—they are either covered by the Policy or, as we find in this case, they are not.  The exclusions clause simply does not apply.

First, the Policy states that "this Policy is for your benefit alone and no other person has any rights or benefits," and that "[t]hroughout this Policy the words 'you' and 'your' refer to the named Insured in the Declarations." Since the Agency actually *is* separate from TMTA for legal purposes, both for the purpose of receiving insurance commissions and under the Policy, the phrase "for your benefit alone" could not have been referring to the Agency.

Second, the TMTA itself has admitted that it is separate from the Agency. As the district court noted, the TMTA argued in state court, in response to a counterclaim by Tyler, that the Agency was the entity that was due the commissions, not the TMTA, and the state court appeared to agree. *See Tooling, Mfg. & Technologies Ass'n v. Hartford Fire Ins. Co.* (*Tooling II*), No. 08-cv-11812, 2010 WL 4366878, at *1 n.3 (E.D. Mich. Oct. 28, 2010); *Tyler I*, No. 07-081120-CZ, slip op. at 5–6 ("The Court finds that . . . Tyler wrongfully exerted control over commissions and bonus payments that *should have been paid to the Agency*." (emphasis added)); *see also id.* at 8–9 ("Plaintiffs' evidence shows that Tyler made sales to TMTA members *in connection with his work for the Agency*, and then misdirected commissions and bonuses from those sales to his companies. . . . Plaintiffs assert that Tyler breached his duties by arranging for commissions and bonuses that *should have been paid to the Agency* to instead be paid to his companies . . . ." (emphasis added)). Because Tyler did not include the Agency in his counterclaim for unpaid commissions, the TMTA argued that the state court should reject any claim by Tyler against the TMTA for commissions he should have been paid. That the TMTA would appear to agree that the Agency should be treated differently from the TMTA for some purposes supports the district court's conclusion that the entities are treated differently under the Policy.[6]

---

[6]The district court also held that it would not "disregard the distinction the law makes between the [Agency and TMTA], and dishonor TMTA's business decision to create the Agency as [a] separate legal entity and not add it as an insured to the Policy." *Tooling I*, 2010 WL 3464329, at *4. It is true that Michigan law treats limited liability companies separately from their members. *See* Mich. Comp. Laws § 450.4504(2) ("A member has no interest in specific limited liability company property."); *Trident-Allied Assocs., LLC v. Cypress Creek Assocs., LLC*, 317 F. Supp. 2d 752, 754 (E.D. Mich. 2004) ("[The] Michigan legislature fashioned the limited liability company to be a legal entity distinct from its members."); *Wells v. Firestone Tire & Rubber Co.*, 364 N.W.2d 670, 674 (Mich. 1985) ("We recognize the general principle that in Michigan separate entities will be respected."). But we caution that because the issue is one of contract interpretation, whether the Agency is distinct from the TMTA for legal

Finally, we think it is significant that the Agency is not listed as a covered insured under the Policy even though *six other* entities closely related to the TMTA are. This raises the question:  If the parties intended that these kinds of entities would be covered by the Policy simply because the TMTA was, why were those six entities added to the Policy?  Not only is there nothing in the contract that would contemplate that the Agency would be covered by the Policy, by adding these six additional entities the parties implicitly demonstrated an intent *not* to cover the Agency.  Accordingly, we hold that the Agency has no rights or benefits under the Policy, and the Policy does not cover any of the Agency's losses due to employee theft.

**B.**

Next, we examine whether the employee theft provision covers the TMTA's claims—that is, whether the TMTA's loss of income from the Agency "result[ed] directly from" Tyler's theft.  The parties dispute only the word "directly" in this Policy provision.  Based on the plain meaning of the word, we hold that Tyler's theft from the Agency did not "directly" result in the TMTA's loss.

In Michigan, "reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings, . . . [and] [w]hen considering a word or phrase that has not been given prior legal meaning, resort to a lay dictionary such as Webster's is appropriate," *Citizens Ins.*, 730 N.W.2d at 686 (internal quotation marks and citations omitted), so we turn to the dictionary.  *Webster's* defines "directly" as:

> 1a:  without any intervening space or time:  next in order
> . . . .
> 2a:  straight on along a definite course of action without deflection or slackening . . . [;] d:  simultaneously and exactly or equally
> 3:  in close relational proximity . . . [;]
> 4a:  without any intervening agency or instrumentality or determining influence:  without any intermediate step
> . . . .

---

purposes—while germane to our deliberation—must be carefully distinguished from whether the Agency is covered under the Policy.

*See Webster's Third New Int'l Dictionary* 641 (1981), *available at* http://unabridged.merriam-webster.com/cgi-bin/unabridged?va=directly (last visited May 23, 2012). *Black's Law Dictionary* defines "directly" as:

> In a direct way without anything intervening; not by secondary, but by direct, means.

*Black's* further defines "direct" as:

> Immediate; by the shortest course; without circuity; operating by an immediate connection or relation, Instead of operating through a medium; the opposite of indirect.
>
> In the usual or natural course or line; immediately upwards or downwards; as distinguished from that which is out of the line, or on the side of it; the opposite of collateral. In the usual or regular course or order, as distinguished from that which diverts, interrupts, or opposes; the opposite of cross, contrary, collateral or remote.
>
> Without any intervening medium, agency or influence; unconditional.

Finally, *Black's* defines "direct loss" to mean:

> One resulting immediately and proximately from the occurrence and not remotely from some of the consequences or effects thereof.

*See Black's Law Dictionary* 459–60 (6th ed. 1990). The primary word used to describe "directly" in each of these definitions is "immediate," and each of the dictionaries defines "directly" or "direct" as "without anything intervening" or "without any intervening space or time . . . agency or instrumentality." Thus, the Policy covers the TMTA only for "loss of or damage to 'money', 'securities' and 'other property' which results [immediately and without any intervening space, time, agency, or instrumentality] from 'theft' by an 'employee.'" On its face, this definition would exclude the type of loss sustained by the TMTA from coverage under the Policy.

Other jurisdictions have considered the meaning of the word in the context of similar insurance policies. The weight of the authorities define "directly" as meaning "immediate"—known by some as the "direct is direct" approach—although other

jurisdictions espouse a "proximate cause" approach. *See Direct Mortg. Corp. v. Nat'l Union Fire Ins. Co.*, 625 F. Supp. 2d 1171, 1174–76 (D. Utah 2008) (noting that courts in various jurisdictions are split over what a "direct loss" is and siding with the "direct is direct" approach, which "requires a court to focus on whether the employer suffered actual depletion of funds as a direct (immediate) result of the employee's conduct"); *Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*, 249 F. Supp. 2d 19, 27 (D. Mass. 2003) ("Courts interpreting . . . [similar policies] have consistently concluded that the insured does not suffer a direct loss unless the insured's assets, and not those of a third party, are reduced because of the offending employee's wrongful conduct." (citations omitted)), *aff'd*, 346 F.3d 259 (2003). The debate over the "directly" language first began when the Surety Association revised its standard fidelity-contract form to replace the term "loss resulting through" with "directly resulting from." *See Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, No. 4791, 2010 Del. Ch. LEXIS 156, at *51–55 (Del. Ch. July 23, 2010), *transferred by* No. 4791, 2010 Del. Ch. LEXIS 198 (Del. Ch. Sept. 24, 2010); *accord First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567–70 (7th Cir. 2009). This change was made to combat court cases that found coverage under fidelity policies where the "liability of the insured is based on the third party's damage resulting from an act which, if directed against the insured, would have resulted in a covered loss." *Mass. Mutual*, 2010 Del. Ch. LEXIS 156, at *53 (citation and internal quotation marks omitted); *see First State Bank*, 555 F.3d at 570 (noting that courts had erroneously "borrowed [causation principles] from tort law to decide loss-causation issues" in fidelity policies, and that "[i]nsurance coverage cases are not concerned with the philosophical social-duty underpinnings of tort law. The action sounds in contract, and our task is to interpret the parties' agreement." (citations omitted)). But regardless of the impetus for the "directly resulting from" language within employee fidelity policies, it remains the case that state courts and federal courts interpreting state law are split on how to interpret the provision. The policies these courts have interpreted—although differing in industry, content, and specific conduct covered—share two fundamental features: (1) they are fidelity contracts to protect against employee theft, fraud, destruction of property, or other misfeasance against the

insured; and (2) they protect against a loss "directly resulting from," "resulting directly from," "resulting solely and directly from," or "directly caused by" said fraud, theft, or other misfeasance.  They are not *liability* policies, which protect the insured against liability for losses incurred by third parties due to actions by the insured's employees. *See, e.g.*, *Vons Cos., Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 492–93 (9th Cir. 2000).

As we mentioned, at least a simple majority of courts that have considered the issue favor a "direct is direct," or analogous reasoning, approach in employee fidelity bonds or insurance contracts—specifically, courts interpreting the law of the following states:  California, *Vons*, 212 F.3d at 492–93; Delaware, *Mass Mut.*, 2010 Del. Ch. LEXIS 156, at *57–58; Georgia, *Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.*, No. CV305-167, 2007 U.S. Dist. LEXIS 96529, at *10–13 (S.D. Ga. Sept. 14, 2007); Illinois, *First State Bank*, 555 F.3d at 567–70; Iowa, *City of Burlington v. Western Sur. Co.*, 599 N.W.2d 469, 472 (Iowa 1999); Massachusetts, *Fireman's Fund*, 249 F. Supp. 2d at 26–28, *and Commerce Bank & Trust v. St. Paul Mercury Ins. Co.*, No. 04-1264B, 2005 Mass. Super. LEXIS 692, at *14–15 (Mass. Sup. Ct. June 7, 2005); Minnesota, *Cargill, Inc. v. Nat'l Union Fire Ins. Co.*, No. A03-187, 2004 Minn. App. LEXIS 33, at *30–33 (Minn. Ct. App. Jan. 13, 2004); Rhode Island, *Armbrust Int'l, Ltd. v. Travelers Cas. & Sur. Co. of Am.*, No.04-212, 2006 U.S. Dist. LEXIS 25640, at *5–6, *23–27 (D.R.I. May 1, 2006); Texas, *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 629 (5th Cir. 1998), *aff'g* 962 F. Supp. 956 (N.D. Tex. 1996); Utah, *Direct Mort.*, 625 F. Supp. 2d at 1174–76; and Wisconsin, *Tri City Nat'l Bank v. Fed. Ins. Co.*, No. 03-0305, 2004 WI App 12, at *801–02 (Wis. Ct. App. Dec. 9, 2003).  *Cf. Investors Title Co. v. Hammonds*, 217 S.W.3d 288, 300–01 (Mo. 2007) (analyzing an employee fidelity policy and concluding that it covers only theft of the insured's property, "provided no rights or benefits to any other person or organization," and did not cover against third-party loss, but did not specifically state whether the phrase "resulting directly from" or some variant was included in the policy).  A number of these courts have described the "direct is direct" approach as the majority rule.  *See First State Bank*, 555 F.3d at 572 (noting that this is the "general rule"); *Mass Mut.*, 2010 Del. Ch. LEXIS 156, at *57–58; *Tri City*, 2004 WI App 12, at *801–02; *Commerce Bank*, 2005 Mass. Super. LEXIS 692, at *14;

*see also* Gary J. Valeriano & Carleton R. Burch, *The Interpretation of a Direct Loss Under Fidelity Bonds*, 33 SUM-Br. 32, 33 (2004) (Am. Bar. Ass'n) ("Those seeking coverage under the [fidelity] bonds have argued that a 'direct loss' is one that is the proximate cause of the insured's loss. . . . On the other hand, insurers have sought to clarify that a direct loss is one that must immediately follow the action covered. . . . This latter view has prevailed."). *But see Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 854 A.2d 378, 385–87 (N.J. 2004) (insisting that the proximate-cause approach predominates).

Courts have applied the proximate cause approach with respect to the law of the following jurisdictions:  Louisiana, *First Nat'l Bank of Louisville v. Lustig*, 961 F.2d 1162, 1167–68 (5th Cir. 1992); Missouri, *Graybar Elec. Co., Inc. v. Fed. Ins. Co.*, 567 F. Supp. 2d 1116, 1127 (E.D. Mo. 2008); Montana, *Frontline Processing Corp. v. Am. Econ. Ins. Co.*, 149 P.3d 906, 911 (Mont. 2006); New Jersey, *Auto Lenders*, 854 A.2d at 385–87; Ohio, *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, Nos. 10-4576/4608, 2012 WL 3608432 (6th Cir. Aug. 23, 2012),[7] and Pennsylvania, *Scirex Corp. v. Federal Ins. Co.*, 313 F.3d 841, 848–50 (3d Cir. 2002).  *Cf. Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co.*, 676 N.Y.S.2d 559, 563–66 (N.Y. App. Div. 1998) (noting that New York insurance law generally equates a direct loss with proximate cause, but then later asserting that fidelity policies cover only the insured's property or funds), *appeal denied*, 711 N.E.2d 643 (N.Y. 1999).  *But see FDIC v. National Union Fire Ins. Co.*, 205 F.3d 66, 76 (2d Cir. 2000) (stating that neither *Aetna* nor the New York courts generally have "construed a fidelity bond's causation requirement," and holding that New York courts would likely adopt a "but for" standard in regards to a bank's decision to give a loan, which results in a loss, that is caused by a fraudulent act by a bank employee).

---

[7] In this recent case, this court found that "the phrase 'resulting directly from' does not unambiguously limit coverage" to a "direct as direct" approach and so holds that "the Ohio Supreme Court would apply a proximate cause standard" simply because it is the more liberal construction. *Id.* at *8-9. The plaintiff in *Retail Ventures* was only able to cite a pair of old Ohio appellate decisions from other first-party coverage contexts to support their position. *Id.* at *8.  The court noted that "[t]he Ohio courts have not decided whether to apply proximate cause in the context of a fidelity bond or commercial crime policy." *Id.*

By claiming that it was "inevitable" and "inescapable" that it would suffer a loss due to Tyler's actions, the TMTA is essentially arguing that we should apply the "proximate cause" definition for "directly." We decline to do so because we find the "direct is direct" approach more persuasive. As the Agency is a separate entity from TMTA, both legally and for the purposes of the Policy, Tyler's theft of commissions intended for the Agency does not directly result in a loss to TMTA—there was an intermediate step between Tyler's theft and TMTA's loss, no matter how closely aligned the Agency and TMTA are. Accordingly, the Policy does not demonstrate that the parties intended to cover the TMTA's losses due to Tyler's misdirection of Agency commissions.

The dissent argues that we should follow an unpublished opinion by the Michigan Court of Appeals that construes, in the context of a physical property damage insurance policy, the word direct to mean "'immediate' *or* 'proximate.'" *See Acorn Inv. Co. v. Mich. Basic Prop. Ins. Ass'n*, No. 284234, 2009 WL 2952677, at *2 (Mich. Ct. App. Sept. 15, 2009) (emphasis added). Although we are loath to give preclusive effect to an unpublished opinion, an opinion that does not have precedential value even in Michigan courts and which no other Michigan court has followed, *see* MCR 7.215(C)(1), we recognize that prior cases in this circuit have held that we should follow even unpublished state cases on points of state law unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise." *Ziegler*, 249 F.3d at 517. We are convinced that the Michigan Supreme Court would adopt a "direct is direct" approach were it to consider the issue.

First, as we have noted, the Michigan Supreme Court has repeatedly stated that where a term in an insurance policy has not been previously defined, the court should look to its plain meaning. *See Citizens Ins.*, 730 N.W.2d 682, 686 (Mich. 2007) ("[R]eviewing courts must interpret the terms of the contract in accordance with their commonly used meanings, . . . [and] [w]hen considering a word or phrase that has not been given prior legal meaning, resort to a lay dictionary such as Webster's is appropriate."); *accord Hall v. Equitable Life Assur. Soc'y*, 295 N.W. 204, 219 (Mich.

1940) ("It is a general rule that where the words of any written instrument are free from ambiguity in themselves, . . . such instrument is *always* to be construed according to the strict, plain, common meaning of the words themselves." (emphasis added)).  *Acorn* actually cited to a dictionary that defined "direct" to mean "without intermediary agents, conditions, etc.; immediate," which comports with our "direct is direct" approach, but the *Acorn* opinion chose to ignore its plain meaning in favor of a proximate cause rule adopted in other jurisdictions.[8]  *Acorn* itself is persuasive data of the rule that the Michigan Supreme Court would adopt.

Second, we have previously recognized that "relevant data [regarding what the Michigan Supreme Court would do] also include[s] . . . the majority rule among other states."  *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995).  As we have noted, the weight of the authorities supports a "direct is direct" approach over a proximate cause interpretation.  Third, the court in *Acorn* did not explicitly apply its proximate cause definition of "direct" to the facts of the case; we are left to speculate, to some extent, as to how the rule would even function in a Michigan court, which we are disinclined to do.[9]  At best, the *Acorn* court is assuming a direct

---

[8] *See Acorn*, 2009 WL 2952677, at *2 (citing *de Laurentis v. United Services Automobile Ass'n*, 162 S.W.3d 714, 723 (Tex. App. 2005); *Cresthill Indust. v. Providence Wash. Ins. Co.*, 385 N.Y.S.2d 797, 803–04 (N.Y. Sup. Ct. 1976)).

[9] This is the entirety of the discussion in *Acorn* about the meaning of "direct" within the insurance policy:

> Here, the insurance policy expressly requires that "direct physical loss" be caused by the act of vandalism.  The use of the word "direct" signals "immediate" or "proximate" cause, as distinct from remote or incidental causes.  *de Laurentis v. United Services Automobile Ass'n*, 162 S.W.3d 714, 723 (Tex. App. 2005); *see also Roundabout Theatre Co. v. Continental Cas. Co.*, 302 A.D.2d 1, 8, 751 N.Y.S.2d 4 (2002) (plain meaning of the words "direct" and "physical" preclude any off-site property damage); *Random House Webster's College Dictionary* (1997), p. 371 (defining "direct," in pertinent part, as "without intermediary agents, conditions, etc.; immediate").  But causation does not require that vandalism be the last act in the chain of events upon which the loss is based.  *Cresthill Industries, Inc. v. Providence Washington Ins. Co.*, 53 A.D.2d 488, 498-499, 385 N.Y.S.2d 797 (1976).  The removal of severed fixtures from the premises does not change the essential character of a completed act of vandalism.  *Id.* at 497, 385 N.Y.S.2d 797.

> Because no genuine issue of material fact was shown with respect to whether an act of vandalism, as understood in its plain and ordinary sense, occurred in this case, the trial court erred in finding that the vandalism peril was inapplicable as a matter of law.  But because the parties' evidence was not directed at or factually developed with regard to the particular items of "direct physical loss" that plaintiff sought to recover under the policy, we cannot conclude that either party was entitled to summary disposition with

physical loss without discussion, and its lack of application is not particularly helpful to this case, which has dramatically different—even unique—facts. Further, since there are no other Michigan courts that propounded this proximate cause rule, before or since, we are left with *Acorn*'s paltry analysis. Finally, *Acorn* and *Universal Images*,[10] our recent, unpublished opinion interpreting *Acorn*, while insurance cases, dealt with a different type of insurance policy than that which is at issue here—property damage insurance versus an employee fidelity policy. As we noted, the "result[ed] directly from" language was adopted specifically for employee fidelity policies for a reason—to prevent coverage for third-party losses. In this instance, to import a definition for a property damage term to a fidelity policy would be to compare apples and oranges. *Cf. Tri City*, 2004 WI App 12, at *801–02 (comparing casualty policies with fidelity bonds and noting that "proximate cause cases involving casualty policies are not really relevant. . . . Casualty policies are written with a different intent and they rarely contain the limiting language found in fidelity bonds."). And given that *Acorn* provided a somewhat vague and certainly internally inconsistent analysis of "direct" in the context of a different type of insurance policy, we believe *Acorn* is distinguishable from this case.

The TMTA also argues that because Tyler owed a fiduciary duty to both the TMTA and the Agency, (1) as soon as he stole the commissions that were intended for the Agency he breached his fiduciary duties to TMTA and the Agency; (2) he was required under Michigan law to hold the commissions in trust for TMTA and the Agency; (3) under Michigan law he had a duty to, and could have, repaid the stolen commissions directly to TMTA rather than the Agency.[11] But whether Tyler is liable

---

respect to the amount of plaintiff's covered loss.

*Acorn*, 2009 WL 2952677, at *2.

[10] --- F. App'x ----, No. 10-1564, 2012 WL 1181541 (6th Cir. Apr. 10, 2012).

[11] The TMTA also argues that because the Agency did not have any employees it could not have been covered by an employee theft policy, and that "[t]he trial court's reasoning therefore forecloses TMTA from ever being able to secure insurance for employee theft which occurs in the course of performing Agency insurance work." Appellant's Br. at 24. But the Policy clearly states that "[a]n 'employee' of any Insured is considered to be an 'employee' of every Insured"; there was nothing to prevent the Agency from being covered by the Policy had the TMTA added it as a named insured. The TMTA argues that this provision is unclear, but it seems clear to us: if the employee of one covered insured steals from another covered insured, the employee is treated as if he or she were employed by both

to the TMTA or the Agency under agency law is a different question from whether the Policy covers the loss of the commissions that were, as all parties admit, intended to be paid to the Agency. That Tyler breached his fiduciary duty to TMTA at the moment he diverted the commissions does not mean that he directly caused a loss to TMTA at the moment of diversion. That Tyler *could* have paid the commissions to the TMTA does not change the business environment in which Tyler, the TMTA, and the Agency operated. More importantly, it does not change the nature of the agreement between the TMTA and Hartford—the terms of which we must enforce.[12]

### III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

and the theft is covered.

[12]The TMTA cites a number of insurance contract cases to support the position that it suffered a direct loss, but these cases are distinguishable. *See Philip R. Seaver Title Co., Inc. v. Great Am. Ins. Co.*, No. 08-11004, 2008 WL 4427582 (E.D. Mich. Sept. 30, 2008) (distinguishable because it involved employee theft of funds from a bank account of a *covered insured*, which the covered insured replenished with funds from another of its accounts); *Dewitt Bldg. Co. v. Auto-Owners Ins. Co.*, No. 235536, 2003 WL 21362804 (Mich. App. June 12, 2003) (distinguishable because the loss claimed by the plaintiff was different in nature from the loss claimed by the TMTA, and in any event does not demonstrate that the TMTA's loss was direct); *Morris Kirschman & Co., L.L.C. v. Hartford Fire Ins. Co.*, No. 03-1743, 2004 WL 1934848 (E.D. La. Aug. 30, 2004) (distinguishable because the basis for the claim was expressly included by the coverage clause in the policy and the employee fraud was perpetrated on the *covered insured*); *Peoples Sav. Bank of Grand Haven v. Am. Sur. Co. of New York*, 15 F. Supp. 911, 913–14 (W.D. Mich. 1936) (distinguishable because in the banking industry there was an industry practice of automatically paying traveler's checks that the insured bank and the insurance company would have been aware of and would have intended to cover in the insurance policy).

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

JANE B. STRANCH, Circuit Judge, concurring in part and dissenting in part. I concur in Sections I. and II. A. of the majority opinion. I cannot join Section II.B, however, because the majority misapplies the "direct is direct" approach to bar TMTA from coverage under Hartford's crime shield policy for a direct loss resulting from employee theft.

The only policy construction issue Hartford presented to our court is this: Does the policy's indirect loss exclusion require denial of coverage for Tyler's theft of TMTA's money. We summarily and correctly dispose of that issue in footnote 5 of the majority opinion by holding that Hartford failed to negate coverage through the "indirect loss" exclusion. That decision resolves the case in favor of coverage. Yet the majority goes on to explain why it thinks Hartford is not required to provide fidelity coverage despite TMTA's payment of premiums and the inapplicability of the indirect loss exclusion. It does so by employing an erroneous construct.

A fidelity bond, like the crime shield policy at issue, provides coverage to the insured for a first-party loss; in other words, immediate financial loss to the insured resulting directly from employee theft or dishonesty—for example, embezzlement. *See Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, — F.3d —, 2012 WL 3608432, at *5 (6th Cir. Aug. 23, 2012); *Vons Cos. v. Fed. Ins. Co.*, 212 F.3d 489, 492 (9th Cir. 2000). A liability policy, by contrast, requires the insurer to pay the insured's obligation to a third party for some act committed by the insured or its employee. *See Lynch Prop., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 629 (5th Cir. 1998). Although a fidelity policy may cover the loss of third-party property in the possession of the insured who acts as bailee or trustee, the policy does "not serve as liability insurance to protect employers against tortious acts committed against third-parties by their employees." *Id.*; *Retail Ventures, Inc.*, 2012 WL 3608432, at *6 n.4.

To preserve the purpose of fidelity bonds, the insurance industry inserted into the standard coverage clause the phrase, "loss resulting directly from." *Retail Ventures, Inc.*, 2012 WL 3608432, at *6. The industry adopted this measure to prevent the insured from transforming first-party fidelity coverage into third-party liability insurance. *See Vons Cos.*, 212 F.3d at 491–93. The majority carefully identifies a split between those courts that follow the insurance industry's preferred "direct is direct" approach to include only first-party claims within fidelity coverage and those courts that employ a proximate cause approach to include coverage for third-party claims within fidelity coverage as well. I do not dispute that such a split exists, for our court has recognized it twice before in recent opinions without joining either side of the debate. *Retail Ventures, Inc.*, 2012 WL 3608432, at **5–6; *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265, 270–71 (6th Cir. 2012). I find the majority's declaration of allegiance to the "direct is direct" approach not just in error but also particularly problematic in light of our court's recent questioning of "whether the distinction between direct cause and proximate cause is a meaningful one." *First Defiance Fin. Corp.*, 688 F.3d at 270 (citing *Staub v. Proctor Hosp.*, — U.S. —, 131 S. Ct. 1186, 1192 (2011) (observing that proximate cause requires only some direct relation between injury asserted and injurious conduct alleged and excludes only those links that are too remote, purely contingent, or indirect)).

My more immediate concern is, however, that the majority unties the "direct is direct" approach from its mooring and uses it in a completely inappropriate way: to analyze the relationship between TMTA, the Agency, and Tyler. According to the majority's reasoning, if Tyler had not committed theft, the commissions would have flowed through the Agency before finally reaching TMTA's bank account. Because the money did not flow directly from Tyler to TMTA, but passed through the Agency, the majority applies the "direct is direct" approach, then construes that approach to mandate the conclusion that the fidelity policy bars coverage.

This analysis distorts the fundamental purpose of the "direct is direct" approach, which is to distinguish between first- and third-party claims and restrict fidelity coverage

to first-party claims, such as we have here. TMTA, the insured, paid Tyler, its employee, to sell insurance policies to TMTA members. TMTA owned the commissions earned on the sale of those policies, but Tyler embezzled the money for his own use. The loss of money TMTA suffered resulted directly from the theft by its own employee. We have no need to decide whether this policy would cover a third-party claim for damages arising from Tyler's misconduct, because that fact pattern is not presented. Moreover, this flawed analysis certainly should not be employed to *deny* coverage when correct application of the "direct is direct" concept to these facts *requires* coverage.

To decide in this case whether the Agency's existence has any impact on coverage, we must inquire into what the insurance contract means by "loss . . . which results directly from theft by an employee." Because the case comes to us under diversity jurisdiction, we must look to Michigan law to interpret the meaning of the policy. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Retail Ventures, Inc.*, 2012 WL 3608432, at *3 (deciding how Ohio courts would interpret similar policy). If the Michigan Supreme Court has not decided an issue pertinent to our analysis, we must "ascertain the state law from all relevant data," which include the state's intermediate appellate court decisions, unless we are convinced by other persuasive information that the Michigan Supreme Court would decide otherwise. *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoted case and internal quotation marks omitted).

The Michigan Court of Appeals has held that the word "direct" means "immediate" or "proximate" cause, "as distinct from remote or incidental causes." *Acorn Inv. Co. v. Mich. Basic Prop. Ins. Ass'n*, No. 284234, 2009 WL 2952677 (Mich. Ct. App. Sept. 15, 2009) (unpublished per curiam). In *Acorn Inv. Co.*, thieves removed copper piping and other fixtures from a rental property, causing extensive flooding in addition to the loss of the piping and fixtures. The property owner sought coverage for the flood damage under a named perils policy for "direct physical loss" caused by vandalism. *Id.* at *2. The Michigan Court of Appeals inclusively defined the word "direct" to encompass both immediate and proximate causes, thereby finding coverage

under the policy for flood damage. *Id.  See also Universal Image Prods., Inc. v. Fed. Ins. Co.*, No. 10-1564, 2012 WL 1181541, *4 (6th Cir. Apr. 10, 2012) (relying on *Acorn Inv. Co.* to discern Michigan law on the meaning of the phrase "direct physical loss or damage").  There is no reason to believe that the Michigan Supreme Court would adopt a different definition of the word "direct."  Thus, to insure seamless application of Michigan law, we should follow our own lead in *Universal Image Prods., Inc.* and apply *Acorn Inv. Co.* to the case before us.

Doing so is consistent with our recent opinion in *Retail Ventures, Inc.*  In that case, our court looked to Ohio law to discern the meaning of the identical phrase "loss resulting directly from" included within a crime policy. *Retail Ventures, Inc.*, 2012 WL 3608432, at *1, *4. Considering the pertinent endorsement and exclusions in that policy, the court determined that the phrase "resulting directly from" did not unambiguously limit coverage to loss resulting "solely" or "immediately"' from the theft itself. *Id.* at *8.  Noting that the Ohio Court of Appeals had applied a proximate cause standard to determine whether there was a "direct loss" under other kinds of first-party coverage, our court concluded that the Ohio Supreme Court "would apply a proximate cause standard to determine whether the loss was covered." *Id.*  We undertook a comparable analysis in *Union Planters Bank, N.A. v. Cont'l Cas. Co.*, 478 F.3d 759, 764 (6th Cir. 2007), where we relied on Tennessee law holding that the definition of "direct cause" incorporates the overlapping concepts of "proximate cause" and "efficient cause" in order to find coverage under a  crime policy for loss "resulting directly from" forgery. *See also Scirex Corp. v. Fed. Ins. Co.*, 313 F.3d 841, 850 (3d Cir. 2002) (holding that dishonesty of nurses employed by Scirex Corporation rendered medication studies worthless so that nurses' conduct "proximately, and therefore directly, caused Scirex's losses.").

Tyler's theft of commissions owned by TMTA—even if not characterized as immediate due to the existence of the Agency—was certainly the proximate cause of TMTA's loss. *See Acorn Inv. Co.*, 2009 WL 2952677, at *2. TMTA formed the Agency as a mere conduit for the payment of commissions in order to comply with Michigan

insurance law, which forbids TMTA from selling insurance directly to consumers.  As the district court explained, the Agency, which is a single-member limited liability company controlled by TMTA, accumulates no income, pays no taxes, owns no property, and has no employees.  TMTA absorbs all of the Agency's income and losses, and pays all of the taxes.  The Agency's income is, by law, TMTA's income.  In addition, TMTA paid Tyler as its employee.  Tyler's gains came only at TMTA's expense.  *See Gonzalez Design Eng'g, Inc. v. Citizens Ins. Co.*, No. 187413, 1997 WL 3335047, at *2 (Mich. Ct. App. Apr. 15, 1997).  This is because, as we have expressly recognized, "[e]mbezzlement is a zero-sum game.  For the employee to win, the employer must lose."  *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1036 (6th Cir. 1991).  TMTA suffered a loss of money which resulted immediately or proximately from Tyler's theft of the commissions owed to TMTA.  Consequently, TMTA is entitled to coverage under the policy for that loss.

"The purpose of insurance is to insure against a loss."  *Fed. Ins. Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, 415 F.3d 487, 495 (6th Cir. 2005).  We should not construe a policy to defeat coverage unless the policy language requires it.  *Id.*  The language of the crime shield policy, properly construed, does not defeat coverage; it authorizes coverage.  Accordingly, for the reasons stated, I would reverse the district court's grant of summary judgment in favor of Hartford and remand with an instruction to enter judgment in favor of TMTA for the limits of the policy.